807 A.2d 125

**CAMBRIDGE TECHNOLOGIES, INC.**

v.

**ARGYLE INDUSTRIES, INC.**

**No. 1519, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 9, 2002.

---

William W. McAllister, Jr. (Demetrios G. Kaouris and Miles & Stockbridge, P.C. on the brief), Cambridge, for appellant.

Stephen H. Kehoe (Ewing, Dietz, Turner & Kehoe, P.A. on the brief), Easton, for appellee.

Argued before SALMON, SHARER, and CHARLES E. MOYLAN, JR., (Ret., Specially Assigned), JJ.

SALMON, Judge.

In the fall of 1997, Argyle Industries, Inc. ("Argyle"), contracted to deliver 14,500 sets of parts to Cambridge Technologies, Inc. ("Camtec"). The parts were to be delivered in accordance with a schedule that was set forth in a purchase order. Camtec intended to assemble the parts manufactured by Argyle (and others) and to sell the assembled product to the Department of Defense ("DOD") in fulfillment of a contract it had with the U.S. government.

Argyle did not meet the delivery schedule set forth in its contract with Camtec. Nevertheless, Argyle made some late deliveries, and Camtec did not complain about the fact that the delivery schedule was not being met. After Argyle had delivered approximately forty percent of the sets of parts it had promised, and after the deadline for supplying all the contracted-for parts had expired, the DOD cancelled its contract with Camtec—due to the latter's tardiness in making its deliveries. Immediately after the DOD contract was cancelled, Camtec, in turn, cancelled its contract with Argyle.

Argyle filed a two-count complaint against Camtec in the Circuit Court for Dorchester County. The first count was for breach of contract, and the second was under a *quantum meruit* theory. Camtec filed an answer to the complaint, together with a counter-complaint, in which it alleged, *inter alia,* that Argyle's tardiness in making delivery caused it to lose the DOD contract. The breach (allegedly) caused Camtec to make expenditures that would have otherwise been unnecessary and to lose the profits it would have otherwise made.

At the conclusion of a bench trial, the trial judge delivered a brief oral opinion in which he found that there had been "substantial compliance" with the contractual terms on Argyle's part and awarded Argyle damages in the amount of $33,541.08 as to Count I. The damage award, purportedly, was based on figures supplied by Camtec.

The trial court disposed of the counterclaim with the following words: "The counterclaim is denied for failure of proof of damages." Camtec filed this timely appeal and raises three major questions:

1. Did the trial court err in finding that Argyle had substantially performed the contract?

2. Did the trial judge err in calculating damages?

3. Did the trial court err in denying Camtec's counterclaim on the basis that it had failed to prove damages?

## I. BACKGROUND FACTS [1]

Argyle, a New Jersey corporation, is in the business of providing wholesalers with manufactured metal products. Camtec is in the business of manufacturing mechanical and electrical systems for the health-care industry. Over the last forty years, one of Camtec's main customers had been the DOD.

In 1996, Camtec began negotiations with the DOD to provide the latter with telescoping I.V. rods, which were to be designed so that I.V. bottles could be hung from the rods and the rods themselves could be attached to stretchers. The negotiations with the DOD were fruitful, and on April 7, 1997, the DOD awarded Camtec a contract for the manufacture of 14,162 I.V. rods. [2] The contract originally required Camtec to deliver the rods on or before November 18, 1997. Between April and October 1997, Camtec worked with the DOD to update the specifications for the rods to conform to the most modern technology.

Meanwhile, in contemplation of fulfilling its contract with the DOD, Camtec, on March 12, 1997, asked Argyle for an estimate of the cost of fabricating 14,500 I.V. poles, 500 "rod-jaws," and 14,500 lock rings, which were all to be used in connection with the assembly of the I.V. rods. Argyle provided Camtec with a price for those items. Later, in September 1997, Camtec sought an additional quote from Argyle for some other items needed in conjunction with the construction of the rods.

On October 6, 1997, Camtec and Argyle entered into the contract that is the subject of this suit. The contract was set forth in Purchase Order No. 01057. In the purchase order, Argyle agreed to produce and deliver 14,500 sets of parts

---

1. The facts set forth in Part I are undisputed.

2. The contract between Camtec and the DOD allowed for a two percent margin, meaning that Camtec could ship to the DOD either two percent more or two percent less than 14,162 I.V. rods.

needed to construct the I.V. rods.[3] The purchase order provided that Argyle was to commence work when Camtec approved Argyle's design prints for each of the seven items that made up the individual sets of parts needed to construct the I.V. rods. The seven parts were: (1) a 17″ tube; (2) a 13.625″ tube; (3) an "upper rod"; (4) a clamp; (5) a "jaw," which attaches to the rod; (6) Lock Rings No. 1; and (7) Lock Rings No. 2. All seven parts were necessary in order for Camtec to commence its assembly of the I.V. rods. The contract between Argyle and Camtec provided that "parts must be free of burrs and chips." Chemical and physical analyses were required to be provided with each shipment.

By December 23, 1997, all the sample parts that Argyle had provided to Camtec had been approved for production. Under the terms of the purchase order, Argyle was to supply twenty-five percent of the 14,500 sets of parts within ten weeks of December 23, 1997, and then provide twenty-five percent of the sets every two weeks thereafter. Thus, under the contract, Argyle was obligated to deliver 3,625 sets of parts by March 3 and a similar number on March 17, March 31, and April 14, 1998. From the outset, Argyle understood that time was of the essence.

After Camtec contracted with Argyle, the DOD and Camtec agreed to revise Camtec's delivery schedule. Camtec was required under the revised contract to deliver fifty percent of the I.V. rods (7,081) by February 27, 1998, and fifty percent by March 31, 1998.

A Camtec representative testified at trial that the extension had been expected because previously he had "verbal assurances" from the DOD that the latter would not hold Camtec to the original schedule. Therefore, in October 1997, when the purchase order was issued to Argyle, Camtec knew it would have additional time to complete the DOD contract—according to Camtec's witness.

---

**3.** Apparently Camtec intended to manufacture more I.V. rods than were ordered because the DOD contract allowed a deviation in quantity of plus or minus two percent. Two percent of 14,162 is 283.24.

By February 27, 1998, Argyle knew that it was not going to be able to meet the schedule of producing twenty-five percent of the order (*i.e.,* 3,625 sets) by March 3, 1998, nor was it going to be able to deliver a similar number every two weeks as scheduled. As of February 27, 1998, of the seven parts ordered, Argyle had delivered all the 17″ tubes, all the 13.625″ tubes, as well as all the upper rods. But it had delivered only 198 clamps and a similar number of jaws. It had delivered no Lock Rings Nos. 1 or 2.

On February 27, 1998, a representative of Argyle wrote Camtec and said:

We will be shipping the following on Monday, 3/2/98:

237   pcs. of Lock Ring # 1

243   pcs. of Lock Ring # 2

686   pcs. of the Jaws

On Wednesday, 3/4/98, we will have 2,000 of each of the four parts fully fabricated[;] it will take a few days for tumbling. We will be producing at least 1,000 sets a week, though this will probably be closer to 2,000 sets a week.

Shipments will be made every other week if this is acceptable to you.

If you have any questions or comments[,] please do not hesitate to call.

After receipt of the February 27 letter, no one from Camtec protested the revised delivery schedule, nor was Argyle ever told of the deadlines set forth in Camtec's contract with the DOD.

The promises made in the letter of February 27 were not fulfilled. Argyle did send by March 6 (not March 3, as promised) 235 Lock Rings No. 1, 141 Lock Rings No. 2, and 679 jaws. Thus, by March 6, 1998, Argyle had delivered only 141 complete sets of parts, which was less than five percent of the 3,625 sets due as of March 3.

Argyle wrote Camtec on March 6, 1998, and said:

As we discussed, we will be shipping you the following on or before Friday 3/13/98:

2,000 pcs. P/N 901042, Clamp

3,000 pcs. P/N 901048–0, Jaw

3,000 pcs. P/N 901047–0, Lock Ring # 1

3,000 pcs. P/N 901046–0, Lock Ring # 2

We have shipped 143 pieces of Lock Ring 2 and 237 pieces of Lock Ring 1. As soon as we have better information on this we will pass it along.

We will be producing at least 1,000 sets per week. The production should be closer to 2,000 sets per week.

Thank you for your patience. We understand time is of the essence. If you have any questions[,] please do not hesitate to call.

After March 6, 1998, Argyle never came close to delivering 1,000 sets of parts per week—much less 2,000. By March 31, 1998, which was four weeks and four days after the February 27 letter, Argyle had delivered an additional 4,740 jaws but had failed to make delivery of *any* additional lock rings (either No. 1 or No. 2), and only 2,183 clamps. Therefore, by March 31, 1998—the date when, under the terms of the purchase order—10,875 sets of the parts were to have been delivered, only about two percent (141) complete sets had been delivered to Camtec.

In early April 1998, Argyle delivered nearly all the jaws remaining due under the contract. But by April 14, 1998, the date when, under the agreement, all 14,500 sets should have been delivered to Camtec, Argyle had delivered only 1,633 complete sets. Even if appellant had met its own self-imposed 1,000 sets of parts per week schedule, 8,000 sets of parts would have been delivered by April 14, 1998.

Besides delivery problems, the quality of the clamps and lock rings that were delivered by Argyle were unacceptable. As mentioned earlier, the purchase order accepted by Argyle provided that the manufactured product was to be free of burrs (among other things). A burr in an aluminum product is a sharp edge around a hole, caused by drilling of the hole. Before delivery to a customer, aluminum parts go through a

process called "tumbling" to get rid of burrs. According to a witness called by Camtec, one hundred percent of the clamps delivered by Argyle had a burr around the screw holes. The defective clamps were not returned to Argyle; instead, they were fixed by Camtec. The repair procedures for getting rid of a burr in a clamp takes an estimated one and a half minutes per clamp. A somewhat similar problem existed with both Lock Rings Nos. 1 and 2. According to the testimony of Camtec's witness, during the tumbling process, the rough edges around two small holes (where the jaw was to be screwed into the clamp) were "rolled into the thread," thereby causing the thread to be "bugered." The problem was remedied by Camtec's employees tapping out the holes that had "bugered" edges.

On April 30, 1998, the DOD cancelled Camtec's contract to supply I.V. rods due to Camtec's "extreme tardiness" in making deliveries of the final product. Camtec immediately notified Argyle of the cancellation and directed it to stop all work immediately. The next day (May 1, 1998), Argyle sent Camtec a letter, which read as follows:

In regards to the above listed purchase order, please find the following breakdown of our current stage of production:

1. P/N 901042–0—Clamp
a. 5,920 Pieces fabricated/tumbled awaiting shipment
b. 3,172 Pieces not fabricated/tumbled
2. P/N 901047–0—Lock Ring # 1
a. 850 Pieces completed and shipped 4–30–98
b. 5,850 Pieces fabricated/tumbled awaiting shipment
c. 4,133 Pieces not fabricated/tumbled
3. P/N 901046–0—Lock Ring # 2
a. 9,003 Pieces not fabricated/tumbled

The total value of the above listed material is $21,934.88. In addition, there is a balance of $28,509.47 due against material that has already been shipped to your location.

Except for the three parts mentioned in the letter of May 1, Argyle had delivered all the parts that had been ordered.

The problem, however, from Camtec's perspective, was that Argyle had delivered less than one-half the contracted-for complete sets of parts, and without complete sets, Camtec could not assemble the I.V. rods for delivery to the government.

In response to the May 1, 1998, letter, Camtec wrote:

As you have been advised, we have had a cancellation of the contract using the parts set forth in our purchase order 010157. This may turn out not to be a complete cancellation and we are negotiating with the government relative to the specifics in this matter. Please stop all work on this order.

On May 1, 1998, you sent me a memorandum outlining the status of the particular parts which you are making for us and listed monetary values for same.

Please note that the $28,509.47 mentioned in your memo covers material which had been shipped to us, but is in a "hold status" because of possible quality problems. Until these problems are resolved, I am not in a position to comment on this particular item.

We are working as quickly as possible to get a full understanding of the implications resulting from the government action relative to the specific contract. As information develops, we will certainly be in touch with you.

Argyle, on May 4, 1998, provided Camtec with a breakdown as to how they arrived at the $21,934.88 figure mentioned in its letter of May 1, 1998. The next day, May 5, 1998, Argyle sent Camtec a letter saying in regard to the open invoices (*i.e.,* invoices totaling $28,509.47) "[i]f we remove all parts in question, whether it be for count or quality, there is still a $17,060.32 balance." Argyle then detailed how they arrived at that last-mentioned number.

Camtec responded to the May 5 missive by listing a series of invoices where there were "quality discrepancies" and/or quantity discrepancies, or both. On May 7, 1998, Argyle wrote Camtec and said, in confirming a phone conversation, that Argyle was "looking for $17,060.32 by the end of the week for materials on your floor which have been counted, inspect-

ed, and accepted by Camtec." Parenthetically, we note that neither the letter, nor subsequent trial testimony, indicated that Camtec agreed with Argyle's figures. The letter went on to say that the $17,060.32 figure "does not cover material" where Camtec questioned the quality of the work, nor did it include Argyle's work in progress, nor Argyle's expenses for unfabricated aluminum that had been purchased in anticipation of fulfillment of the contract. Argyle demanded, in addition, immediate payment of $5,890.24 for the cost of the unfabricated aluminum.

On June 1, 1998, Camtec wrote Argyle a letter, the contents of which were summed up in the concluding paragraph, *viz:*

In view of Argyle's inability to perform under the Purchase Order which was a major factor in Camtec's ability to perform under the Department of Defense contract, Camtec feels no obligation for further payment of any sort to Argyle.

Earlier in the letter, Camtec had said that

[a] major contributing factor to Camtec's non-delivery [to the DOD] can be traced to Argyle's inability to produce acceptable parts in accordance with the delivery schedule in the original Purchase Order ... and subsequent delivery promises [referring to the letters of February 27 and March 6]. Based on your delivery dates sets forth in [the February 27 letter], Camtec hired workers and started production. This effort had to be discontinued when Argyle failed to ship on 3/2/98 and 3/4/98. In fact, Argyle never achieved anywhere close to shipping 1,000 sets of acceptable parts per week.

After the DOD cancelled its contract, Camtec entered into a modified contract with the DOD to provide 5,947 I.V. rods. The number equaled the number of useable complete sets of parts Camtec had been supplied by Argyle as of April 30, 1998—according to Camtec's figures.

## II. *THE TRIAL*

During the trial of this case, both sides relied primarily on documents that were admitted into evidence without objection.

Those documents spelled out, in a clear fashion, the contract between the parties and presented an understandable picture of what items were delivered by Argyle and when. In addition, two witnesses were called by Argyle and one by Camtec. An unusual feature of the case was there was remarkably little conflict in the testimony of the witnesses.

One slight divergence that separated the parties was that Argyle maintained that it did not know the identity of the customer with whom Camtec had contracted to sell the I.V. rods prior to the April 30, 1998, cancellation. Camtec, on the other hand, presented a witness who testified that from the outset Argyle did know that Camtec had a contract with the DOD. All witnesses agreed that Camtec never advised Argyle of its deadlines under the DOD contract.

Camtec's president, Thomas Holdt, was asked at trial why he did not cancel the contract when Argyle sent the letter dated February 27, changing, or at least attempting to change, the delivery schedule. He answered that if the schedule set forth in the February 27 letter had been met he felt confident that Camtec still could have sold all 14,162 I.V. rods to the DOD. Mr. Holdt explained that he stayed in contact with the DOD, and they had indicated a willingness to amend their contract with Camtec to push back the delivery dates provided they were given firm dates when they could expect to receive the I.V. rods. Therefore, according to Mr. Holdt, "If we had gotten the parts as indicated in the letter of [February] the 27th, I believe I could have made a reasonable presentation to the Department of Defense for extending the delivery dates and delivered the contract."

Mr. Holdt testified that prior to the cancellation of the contract he had been in touch with the DOD because it "hadn't been getting anything [from Camtec]," nor had they "been getting satisfactory answers." As a consequence, the DOD advised Comtec that "they were going to cancel the contract because of late delivery." Mr. Holdt conceded that Camtec never advised Argyle of the problems it was having with the DOD. He explained Camtec's silence by saying it

depended upon Argyle's written schedule that they had presented to us, and if they had stuck to those schedules [Camtec] would have been okay. Even defective parts, we could have cleaned up the defective parts and built I.V. rods.

According to Mr. Holdt, Camtec told the DOD of its problems, but the latter would not give Camtec an extension until it had "some definite figures from us."

During Argyle's counsel's cross-examination of Mr. Holdt, the witness was asked why Camtec did not alert Argyle to the fact that late deliveries were jeopardizing Camtec's contract with the DOD. Mr. Holdt replied that no notification was made because "our arrangement was between Argyle and Camtec, not Argyle and the Department of Defense." [4]

Argyle's counsel also cross-examined Mr. Holdt regarding the letter he wrote dated June 1, 1998, in which he said that a "major contributing factor" to the cancellation of the DOD contract was Argyle's late deliveries. Counsel asked whether "there were other factors that caused" DOD's cancellation. Mr. Holdt steadfastly maintained that there were none. Thereafter, counsel for Argyle again suggested by his questions that there was more than one cause for delay when he directed Mr. Holdt's attention to a June 18, 1998, letter from Mr. Holdt to a representative of the DOD. In that letter, Camtec requested an extension of four months for the completion of the original contract and said that the request "is

---

4. On re-direct examination, Mr. Holdt said that he did not understand why Argyle's counsel had stressed the dates of the contracts between the DOD and it because

   our agreement with Argyle was not contingent upon that contract[;] ... our agreement with Argyle was a contract with Argyle. If they had produced, they would have been paid because that's the unit that is used unless they've stopped killing soldiers, and unfortunately, I don't think they have. [The DOD is] going to order. They've ordered more of them since that contract. They're going to order some more of those things. And we, in the past, have built for stock to that type of situation. We knew they were going to come back, and there were going to be additional contracts and by buying in quantity and getting a price break you have a very favorable situation.

necessitated by our vendors not delivering material in accordance with our purchase orders." (Emphasis added.) Mr. Holdt denied the implication that more than one vendor was responsible for the delay.

Argyle's proof of damage was simple. Relying on the same figures as set forth in its letter to Camtec dated May 1, 1998, Argyle asserted it was due $28,509.47 for parts already delivered. That last-mentioned figure was based upon the contract price for each part that was shipped. Additionally, Argyle claimed it was entitled to the sum of $21,934.88 for aluminum materials purchased in anticipation of fulfilling the contract, but not manufactured, together with parts that were manufactured but not yet delivered.

In support of its counterclaim, Camtec introduced an exhibit that set forth its damages as follows:

| | |
|---|---|
| Loss of Value/Mitigation | $ 8,623.15 |
| Lost Profits on 8215 Rods | $19,498.78 |
| Unutilized Goods/Services | $25,349.40 |
| Amount Paid to Argyle | $30,727.86 |
| Amount Due Argyle for 5,947 Sets of Parts | ($33,541.08) |
| Total Damages | $50,658.11 |

The $8,623.15 figure represented the amount it cost Camtec to remedy the defects in the lock rings (both Ring Nos. 1 and 2) and the clamps. The category "Unutilized Goods/Services" included costs for materials purchased but not utilized due to the loss of the DOD contract and $9,529.40 for the labor involved in threading tubes supplied by Argyle but not used, again due to the loss of the DOD contract.

At the conclusion of the case, the trial judge commenced by saying that, although the contract was far from a "Hornbook example" of what a contract should be, a contract, nevertheless, existed "and there was substantial compliance with the contract by plaintiff." The trial judge concluded his brief opinion in these words:

So under the first count of the complaint—I'm going to use [Camtec's counsel's] figures or Camtec's figures here

under the first count breach of contract thirty-three thousand five hundred forty-one dollars and eight cents plus costs.

The counterclaim is denied for failure of proof of damages. . . .

## III.

**Did the trial court err in finding that Argyle had substantially performed[5] the contract?**

■ Argyle claims that the trial judge was not clearly erroneous when he found that Argyle had substantially performed its contract.[6] Camtec counters that the court was clearly erroneous in this regard because (1) at the time that the parties entered into the contract, Argyle acknowledged that time was of the essence; (2) under the unambiguous terms of the contract, Argyle was required to deliver 3,625 sets of parts by March 3, 1998, and a similar number every two weeks until April 14, 1998, when all 14,500 sets of parts were to be delivered; (3) Argyle never came close to meeting the delivery schedule set forth in the contract.

The evidence was undisputed that as of April 30, 1998, the date that Camtec cancelled the contract, Argyle had produced approximately forty-one percent of the sets of parts it was obligated to deliver. The record is also clear that the schedule announced by Argyle in its February 27, 1998, letter was not met either. Moreover, at trial, Argyle gave no excuse for its failure to make timely deliveries.

---

5. In their briefs, the parties assume that the trial judge used the term "substantial compliance" to mean the same thing as "substantial performance." We believe that the assumption is a valid one.

6. We are required to use the clearly erroneous test set forth in Maryland Rule 8–131(c), which reads:

**Action tried without a jury.** When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Argyle devotes only one paragraph in its brief to explain why it contends that the evidence showed that it had substantially performed its contract. Appellee says:

The instant case is quite different [from *Della Ratta, Inc. v. American Better Community Developers, Inc.*, 38 Md. App. 119, 134, 380 A.2d 627 (1977) ], because Argyle produced goods for Camtec at Camtec[']s request. There is no question that Argyle provided Camtec with materials that Camtec used and there is no question that Argyle manufactured materials for Camtec[']s use. During April and May of 1998, when Camtec told Argyle to stop work, the only dispute was to the price of the materials that had been delivered and the price of the materials that had been manufactured yet not delivered. It would be totally inequitable for Camtec to have retained those materials that Argyle had delivered to it without compensating Argyle for them. The remaining materials were specialty items to which Argyle was entitled to compensation. The court[']s finding in this regard demonstrates that it must have fully understood the [substantial performance] doctrine when it applied it.

(Reference to extract omitted.)

The fact that Argyle supplied some sets of parts that Camtec used is scarcely determinative of whether it substantially performed the contract, especially when the parties agreed that time was of the essence. In this regard, what was said in 15 Richard A. Lord, *Williston on Contracts* § 44.53 at 224–25 (4th ed.2000) (hereinafter "*Williston on Contracts* "), is apposite:

### Effect of Express Contract Provision

*The substantial performance rule does not apply where the parties, by the terms of their agreement, make it clear that only complete performance will be satisfactory.* The general acceptance of the doctrine of substantial performance does not mean that the parties may not expressly contract for literal performance of the contract terms; how-

ever, where the parties have not made it clear that literal and exact compliance is necessary, substantial performance will suffice, especially if requiring literal performance will result in a forfeiture. Thus, substantial performance is ordinarily not applicable to excuse the nonoccurrence of an express condition precedent to a contract. Stated otherwise, if the terms of an agreement make full or strict performance an express condition precedent to recovery, then substantial performance will not be sufficient to enable recovery under the contract. *A typical example of a clause requiring strict compliance is one making time of the essence of the contract; substantial, although late, performance, is not generally sufficient to permit the party who has not performed in a timely manner to bring an action on the contract.*

(Footnotes omitted) (emphasis added).

We interpret Argyle's argument that the only dispute between the parties concerned price up until the contract was cancelled as an assertion that Camtec waived the issue of timely delivery by its failure to make any objection to Argyle's tardiness prior to cancelling the contract. This assertion has no merit.

The Court of Appeals has defined waiver as "[t]he intentional relinquishment of a known right...." *Government Employees Ins. Co. v. Group Hospitalization Medical Services, Inc.*, 322 Md. 645, 650, 589 A.2d 464 (1991). "The intention to waive must be clearly established and will not be inferred from equivocal acts or language." *Charles J. Frank, Inc. v. Associated Jewish Charities of Baltimore, Inc.*, 294 Md. 443, 449, 450 A.2d 1304 (1982). Moreover,

[m]ere silence, acquiescence, or inactivity is insufficient to show a waiver of contract rights where there is no duty to speak or act.... Forebearance to assert or insist upon a right does not, by itself, constitute waiver. A party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its

obligation under the contract should not ordinarily lead to a waiver of the innocent party's rights.

*Williston on Contracts* § 39:35 at 653.

■ Argyle was well aware of the delivery deadlines at the time it failed to meet them, and when the schedule was not met, there was no duty on Camtec's part to notify Argyle of its breach.

■ The contract here at issue concerned the sale of goods, and therefore Article 2 of the Uniform Commercial Code (hereafter "UCC") was applicable. In *Chemetron Corp. v. McLouth Steel Corp.*, 381 F.Supp. 245, 254 (N.D.Ill.1974), the court held that the UCC does not require that "the buyer give notice where there is nondelivery. . . . [I]n a case of nondelivery, the seller as well as the buyer knows of the breach and needs no further notice." The *Chemetron* court further noted that "[w]hen the seller has . . . failed to make delivery, the buyer may proceed directly to a remedy. No rejection or notice is needed, most probably because the seller in these cases reasonably should know that he has not performed." *Id.* See also *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 973 n. 39 (5th Cir.1976).

■ In a related argument, Argyle says: "Given Camtec's complete[ ] nonchalance regarding delivery dates until June 1, 1998, the [c]ourt was justified in finding any commercially reasonable schedule, including the one on which Argyle actually made deliveries, to be appropriate." There are two answers to that assertion. First, Argyle had no right to unilaterally modify the contract. It is a "basic principle of contract law . . . [that] a party to a contract does not have any unilateral right to modify. . . ." *Metropolitan Life Insurance Co. v. Promenade Towers Mutual Housing Corp.*, 84 Md.App. 702, 714, 581 A.2d 846 (1990). Moreover, modification requires mutual assent of the parties. *L & L Corp. v. Ammendale Normal Institute*, 248 Md. 380, 384, 236 A.2d 734 (1968). Second, there is nothing in the evidence that would justify a finding that Argyle's tardy deliveries were "commercially reasonable."

■ Except for pointing to Camtec's silence—which is insufficient to show assent to a modification—Argyle points to nothing else in the record that would justify a finding that Camtec agreed to a modification of the contract. Moreover, even if the February 27 and March 6, 1998, letters could somehow be construed to be a mutually agreed upon modification of the contract, Argyle never came close to meeting the schedule as modified.

Argyle also contends that, in the month that followed Camtec's cancellation of the contract, the correspondence between the parties showed that Camtec recognized "its liability to Argyle." Nothing in the correspondence can possibly be interpreted as a "recognition of liability." After April 30, 1998, Camtec simply made inquiry as to what monies Argyle claimed were due. It never agreed to pay those monies either implicitly or explicitly.

The evidence in this case was undisputed that Camtec could not make use of the individual parts supplied by Argyle until complete sets of all seven parts were delivered. Argyle knew that time was of the essence when it agreed to meet the sixteen-week delivery schedule. Despite this knowledge, Argyle never met the original schedule nor the schedule it unilaterally modified. Under these circumstances, the trial judge was clearly erroneous when he found that Argyle had substantially performed its contract.

## IV.

### Did the trial court correctly calculate damages?

The trial judge calculated damages by multiplying the number of useable sets of parts received by Camtec by the contract price for each set (5,947 sets times $5.64 per set), for a total of $33,541.08. That method of calculating damages was clearly erroneous because the court failed to credit Camtec for the $30,727.86 it has already paid Argyle.

In any event, the trial court erred in making *any* damage award under the breach of contract count (Count 1), inasmuch

as Argyle did not substantially perform the contract. This leaves open the question (not directly addressed by either party in their briefs) of whether the case should be remanded so that the trial court can determine whether Argyle was entitled to recover under Count 2, *quantum meruit.*

Although Argyle does not provide any argument in support of the assertion, it does boldly proclaim in its brief that it would be "inequitable for Camtec" to retain materials supplied by Argyle without compensating it for those materials. We interpret this assertion to mean that Argyle contends that it is entitled to an implied in law (or quasi-contract) form of *quantum meruit* recovery. One who proves a quasi contract (contract implied in law) is entitled to recover restitution. *See Mogavero v. Silverstein,* 142 Md.App. 259, 276, 790 A.2d 43 (2002) ("The measure of recovery in quasi-contract (implied in law) cases is based upon restitution."); *see also Mass Transit Admin. v. Granite Constr. Co.,* 57 Md.App. 766, 774, 471 A.2d 1121 (1984). (A *quantum meruit* claim seeking recovery in quasi-contract for restitution is referred to as an action for "unjust enrichment.").

Restatement (Second) of Contracts § 374(1) (1981) discusses the type of restitution, or unjust enrichment damages, a party is entitled to recover:

[I]f a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach.

*Id.*

Here, Camtec justifiably refused to perform based on Argyle's late deliveries. In this Court, and in the court below, Camtec acknowledged that Argyle was entitled to compensation for the sets of parts it was able to use, less the cost of repairing defective parts. Two questions remain, however. Those questions are:

1. Under the *quantum meruit* count, did Argyle prove that it was entitled to recover for parts that were delivered but were not used because complete sets of parts were never shipped?

2. What amount, if any, was Camtec justified in deducting for fixing the parts that were defective?

After Camtec cancelled its contract with Argyle, the latter demanded payment in the amount of $28,509.47 for parts that had been delivered but for which payment had not been made. The $28,509.47 figure was based on the contract price for individual parts. But once Argyle was shown to have breached the contract, it was no longer entitled to the contract price for the various incomplete sets of parts delivered. Instead, the measurement of "unjust enrichment damages is the 'gain to the defendant, not the loss by the plaintiff.'" *Mogavero, supra,* 142 Md.App. at 276, 790 A.2d 43 (quoting *Caroline County v. J. Roland Dashiell and Sons, Inc.,* 358 Md. 83, 95 n. 7, 747 A.2d 600 (2000)).

Argyle failed to prove the value *to Camtec* of the scattered parts Camtec received that did not make up complete sets. We therefore hold that Argyle was not entitled to recover, in *quantum meruit,* for the parts that could not be assembled to make up sets of I.V. rods because the record did not show the value of those parts to Camtec.

Regarding the second question, the evidence was undisputed that some of the parts delivered by Argyle were defective in that they contained "burrs." Camtec gave Argyle timely notice of these defects, and under section 2–714 of the Commercial Law Article of the Maryland Code (1975, 1995 Repl.Vol.), Camtec was entitled to recover damages for any of those non-conforming goods.

With respect to goods that the buyer accepted but gave notice of the non-conformity of the tender, the buyer "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from seller's breach as determined in any manner which is reasonable." Md.Code Ann., Com. Law I § 2–714(1)(1975, 1997 Repl.Vol.). *See also*

U.C.C., Vol. 1, White & Summers, § 10–2 (1995) (Costs to repair a non-conforming tender of goods are recoverable under Section 2–714 as damage due to nonconformity of tender.); 4A Ronald A. Anderson, *Uniform Commercial Code* § 2–714:77 (3d ed.1997); *Federal Signal Corp. v. Safety Factors, Inc.*, 125 Wash.2d 413, 886 P.2d 172, 185 (1994) ("mitigation includes other measures such as repairing the goods so that they are usable in a breach of warranty situation").

The cost of these repairs was $8,623.15. No meaningful evidence contradicted that figure.[7] The amount that Camtec already paid ($30,727.26), together with the cost of repairs ($8,623.15) equals $39,350.41. From that last-mentioned figure, the value of the 5,947 sets of parts ($33,541.08) must be deducted. This means that Argyle owes Camtec $5,809.33 ($39,350.41—33,541.08). Therefore, Argyle was not entitled to recover under Count 2 for unjust enrichment.[8]

### V. *Counterclaim DAMAGES SOUGHT BY CAMTEC*

■ Camtec, in its counterclaim, requested, *inter alia*, a damage award in the amount of $44,848.18 to compensate it

---

**7.** Camtec charged $35 an hour to repair the defective parts. Camtec's president testified that the repair charges figure accurately showed the amount actually spent to repair the defective parts. In rebuttal, Argyle called James Kane, III, Argyle's vice president. The only criticism of the repair charge voiced by Mr. Kane was that he thought that "the shop rate" of $35 per hour was "pretty excessive." He did not, however, say what a reasonable rate would be, nor was any evidence introduced showing that he had any particular expertise or knowledge as to the reasonable rate for such work. Under these circumstances, the testimony of Camtec was not meaningfully rebutted.

Mr. Kane did say that, if Camtec had returned the parts with burrs, rather than performing the correction themselves, the repairs would have cost Argyle nothing because all the work had been done by third-party vendors and those vendors would have been obligated to remedy the defects. In the case at bar, it was indisputably reasonable to fix the defective parts themselves in light of Argyle's tardiness in making deliveries.

**8.** As already mentioned, Argyle made a claim for parts that were not delivered. Because Argyle breached its contract with Camtec, it clearly had no right to recover for such damages either under a breach of contract or unjust enrichment (*quantum meruit*) theory.

for the monies it lost as a consequence of the cancellation of the DOD contract. That last-mentioned figure has two components, i.e., $19,498.78 for loss of profits and $25,349.40 for monies Camtec expended for parts and materials in contemplation of fulfilling its contract with the DOD.

Camtec argues that the only reason that the DOD contract was cancelled was because Argyle had failed to deliver sets of parts in accordance with the contract. This argument does have a factual basis. Camtec produced evidence that, if believed, showed that it had a long relationship with the DOD and, as a result of that relationship, Camtec was justifiably confident that the DOD did not intend to hold it strictly to the delivery schedule set forth in its contract with the DOD. Instead, according to Camtec's evidence, the DOD would have accepted any reasonable (albeit late) delivery schedule, so long as the DOD knew, definitively, when it could expect deliveries. The trouble was, according to Camtec's evidence, that because Argyle did not deliver in accordance with the schedule set forth in the purchase order or even in accordance with its February 27, 1998, letter, Camtec could never make any reliable forecast as to when it could make deliveries to the DOD. Therefore, Camtec argues that, if Argyle had even lived up to the modified 1,000 set per week delivery schedule, Camtec's contract with the DOD would not have been cancelled.

Argyle, on the other hand, argues that Camtec did not prove that its (Argyle's) tardiness in making deliveries was the exclusive cause of the loss of the DOD contract. Argyle points out that under the revised contract with the DOD, Camtec was required to deliver 7,081 sets of I.V. rods by February 27, 1998, and a similar amount by March 31, 1998. If Argyle had performed on schedule, it would not have been required to make any deliveries by February 27, 1998, and thus Camtec, inevitably, would have defaulted on the DOD contract. Three thousand six hundred twenty-five sets of parts were due to be delivered by Argyle on or before March 3, 1998, but even if all those parts had been delivered on schedule, Camtec still would have been required to assemble

and ship them afterwards. And Camtec produced no evidence to show how long it took to assemble and ship the completed I.V. rods once Argyle made delivery.

Argyle further stresses that if it had made *all* its deliveries to Camtec in exact conformity with its contract, only 10,875 sets of parts would have been delivered by the date that Camtec was contractually obligated to assemble and deliver *all* 14,162 sets of I.V. rods to the DOD.

Two letters from Camtec were admitted into evidence that are relevant to the issue as to whether Argyle's tardiness in making deliveries was, as Camtec contends, the sole cause of the loss of the DOD contract. In a letter dated June 1, 1998, Camtec's president said that a *"major* contributing factor to Camtec's non-delivery" to the DOD "can be traced to Argyle's inability to produce acceptable parts in accordance with the delivery schedule set forth in the purchase order and subsequent delivery promises...." (Emphasis added.) One week later, on June 11, 1998, the president of Camtec wrote to an official at the DOD requesting an extension for performance of the contract. He justified the request by saying it was "necessitated by our vendor*s* not delivering material in accordance with our purchase orders." (Emphasis added.) The use of the plural "vendors," coupled with the characterization of Argyle's delinquencies as a "major contributing factor" could reasonably have led the trial judge to infer that there were other causative factors (other than Argyle's delinquencies) that led to the DOD cancellation.

Taking the evidence, as we must, in the light most favorable to Argyle—the prevailing party below—the trial court could have disbelieved Mr. Holdt when he opined that the DOD would not have cancelled the contract if Argyle had made timely deliveries. Therefore, we hold that the trial judge was not clearly erroneous in finding that Camtec had produced insufficient proof that it suffered cancellation of contract damages due to Argyle's tardiness.

■ We do find, however, that the trial judge was clearly erroneous in impliedly finding that Camtec had not produced

sufficient evidence concerning the cost to it of repairing the defective parts supplied by Argyle. The charge of $8,623.15 for fixing the clamps and lock rings that were delivered in a defective condition must be set off by $2,813.82, which is the difference between the value of the sets used ($33,541.08) and what Camtec had already paid ($30,727.26). We shall remand this case to the Circuit Court for Dorchester County with instructions to enter a judgment on the counterclaim in favor of Camtec in the amount of $5,809.33 ($8,623.15 less $2,813.82).

**JUDGMENT ENTERED IN FAVOR OF ARGYLE INDUSTRIES, INC., REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR DORCHESTER COUNTY WITH INSTRUCTIONS TO ENTER A JUDGMENT IN FAVOR OF CAMBRIDGE TECHNOLOGIES, INC., AND AGAINST ARGYLE INDUSTRIES, INC., IN THE AMOUNT OF $5,809.33; COSTS TO BE PAID SEVENTY–FIVE PERCENT BY ARGYLE INDUSTRIES, INC., AND TWENTY–FIVE PERCENT BY CAMBRIDGE TECHNOLOGIES, INC.**