988 A.2d 49

COLLINS/SNOOPS ASSOCIATES, INC.

v.

CJF, LLC, et. al.

No. 2273, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Jan. 27, 2010.

148

Jeffrey L. Forman (Bruce E. Kauffman, Kauffman and Forman, on brief), Towson, for Appellant.

Joseph C. Kovars (Jeffrey A. Regner, Ober, Kaler, Grimes & Shriver, on brief), Baltimore, for Appellee.

Panel: HOLLANDER, MEREDITH, RAYMOND G. THIEME, JR., (Retired, specially assigned), JJ.

MEREDITH, J.

This appeal presents the question of whether a judge who hears a bench trial in a case in which two parties each claim the other breached a contract may deny both claims on the ground that neither party carried its burden of persuading the court that the other party breached the contract. Under the peculiar circumstances of this case, we shall affirm a judgment that denied relief to both the plaintiff and the counterplaintiff.

The case arose from a dispute between a contractor and its subcontractor on a project that involved renovations to three Baltimore County school buildings. The general contractor that won the bid for the project was CJF, LLC (hereinafter "Contractor"), the appellee/cross-appellant. It engaged Collins/Snoops Associates, Inc. (hereinafter "Subcontractor"), appellant/cross-appellee, as a subcontractor to perform over $2.69 million worth of plumbing, heating and air conditioning

mechanical work as part of the renovations. After Subcontractor had completed only a portion of the specified mechanical work, Contractor asserted that Subcontractor was not making acceptable progress in order to meet the strict deadlines required by the County. Contractor terminated Subcontractor and engaged a replacement firm to take over the mechanical work on the schools. Subsequently, Contractor itself was terminated by the County because the County was not satisfied with Contractor's progress.

Subcontractor sued Contractor, its president, and its bonding company, in the Circuit Court for Baltimore County, claiming that Subcontractor was owed $409,720 for the work and materials it had provided prior to the time it was terminated. Contractor filed a counterclaim against Subcontractor, claiming damages that Contractor alleged it had incurred as a consequence of Subcontractor's failure to properly perform the obligations under the subcontract. After a bench trial on the merits, the trial court filed a written opinion in which it stated that "the court finds itself in equipoise as to each party's claim for breach of contract against the other." The trial court continued: "In brief, this court concludes that neither has [Contractor] proved by a preponderance of the evidence that [Subcontractor] failed to perform nor has [Subcontractor] proved by a preponderance of the evidence that it was wrongfully terminated from the school renovation project by [Contractor]." Accordingly, the trial court granted judgment in favor of the defendants—*i.e.,* Contractor, its president, and its bonding company—"for all claims brought against [them] by [Subcontractor]," and the court granted judgment in favor of the counterdefendant, the Subcontractor, "for all claims brought against it by [Contractor]."

Subcontractor and Contractor have both appealed, each seeking to overturn the trial court's denial of their respective claims for damages. As appellant, Subcontractor raises the following questions:

I. Having found that [Subcontractor] provided $409,720 in labor and materials to [Contractor] on the County project, and having further found that [Subcontractor] had not

"failed to perform," was it error for the trial judge not to have awarded [Subcontractor] at least the $409,720 for the labor and materials it provided?

II. Having found that [Contractor] did not prove [Subcontractor] had failed to perform, did the trial judge impermissibly shift the burden to [Subcontractor] to show that its termination was "wrongful"?

III. Having found that [Contractor] did not prove [Subcontractor] had failed to perform, was it error for the trial judge not to have awarded [Subcontractor] its lost profits on the job?

As appellee, Contractor rephrases the appellant's questions as one issue:

Whether the trial court sitting as finder of fact correctly held that [Subcontractor] failed to meet its burden of proving breach of contract where the court found the evidence to be in equipoise.

Additionally, as cross-appellee, Contractor raises the following issue:

Whether the trial court erred in finding that [Contractor] failed to prove its damages.

We conclude that the trial court did not err in entering judgment for the respective defendants as to all claims and counterclaims. Accordingly, we shall affirm the judgments entered by the circuit court.

## FACTS AND PROCEDURAL HISTORY

In 2001, the County entered into a contract with Contractor to renovate three public elementary schools: Chase, Victory Villa, and Hawthorne Elementary. Appellee Carolina Casualty Insurance Company ("Carolina") issued a payment bond to guarantee that Contractor's subcontractors would be paid in the event Contractor wrongfully failed to pay amounts due the subcontractors for supplying labor and materials on the project.

Contractor engaged Subcontractor to perform plumbing and mechanical work on the heating and air-conditioning systems at the three schools. Contractor asked Subcontractor to sign Contractor's "standard" form subcontract agreement, but Subcontractor refused to sign. Nevertheless, the trial court found that Subcontractor, by its conduct, adopted or assented to the terms in the document that it refused to sign. Citing *Porter v. General Boiler Casing Co.*, 284 Md. 402, 410–12, 396 A.2d 1090 (1979), the trial court concluded that the Contractor's form subcontract agreement "constitutes the contract between [Contractor] and [Subcontractor]," despite not being signed by Subcontractor. That finding is not challenged by either party on appeal.

The subcontract agreement contains numerous references to the Contractor's need for timely performance, including a statement that "[i]t is UNDERSTOOD AND AGREED by and between the parties that time is and shall be considered the essence of the contract on the part of the said Subcontractor. . . ." The subcontract further required Subcontractor to "promptly begin said work" and "complete said work as rapidly as said Contractor may judge that the progress of the structure will permit." Similarly, the subcontract called for diligent and uninterrupted performance by Subcontractor:

> The Subcontractor agrees to cooperate with the Contractor and with other Subcontractors in the diligent performance of the work and to prosecute regularly, diligently and uninterruptedly at such rate of progress in such a manner as to enable the Contractor to complete the entire structure within the time specified.

The subcontract called for Contractor to compensate Subcontractor as follows:

> IN CONSIDERATION WHEREOF, the said Contractor agrees that he will pay to the said Sub-contractor, in monthly payments, the sum of TWO MILLION SIX HUNDRED NINETY SIX THOUSAND EIGHT HUNDRED SIXTY DOLLARS. PRICE FIRM—NOT SUBJECT TO ESCALATION

*$2,696,860.00* DOLLARS for said materials and work, said amount to be paid as follows: Ninety per cent. (90%) of all labor and materials which has been placed in position and for which payment has been made by [the County] to said Contractor, to be paid on or about the 7th (approx. 5 weeks) of the following month, except the last payment, which the said Contractor shall pay to said Sub-contractor immediately after said materials and labor installed by said Subcontractor have been completed and approved by the said Architect. It is specifically understood and agreed that the payment to the Subcontractor is dependent, as a condition precedent, upon the Contractor receiving contract payments, including retainer, from the Owner. Subcontractor will only receive retainage after completion of all outstanding punch list items and having furnished warranties and as-built required by the Contract Documents.

On April 30, 2001, Contractor instructed Subcontractor to begin work the next day. From the beginning, Subcontractor's progress was characterized by delays. The cause of Subcontractor's delays was the major point of contention at trial. There was evidence that Subcontractor was slowed because the County failed to timely reply to Subcontractor's requests for information, that the County hindered Subcontractor's work by allowing public access to the schools during potential work hours, and that the Subcontractor's unexpected discovery of asbestos in the school required Subcontractor to suspend work until the asbestos was abated.

On the other hand, there was evidence that Subcontractor itself was unduly slow in performing its work, largely because it failed to provide enough qualified manpower and to secure necessary equipment and materials. Furthermore, Subcontractor's subcontractors caused several mishaps at the work site.

On May 22, 2001, Subcontractor sent Contractor a payment application for work Subcontractor had completed at Hawthorne. On June 22, 2001, Subcontractor sent a second payment application for work done at Hawthorne in the previous

month, as well as first payment applications for work done so far at Victory Villa and Chase.

In July 2001, representatives of the County met with principals of Contractor and Subcontractor and threatened to terminate Contractor if progress on the project did not pick up. On July 24, 2001, Contractor sent a termination letter to Subcontractor, stating: "By reason of your persistent failure to properly man the projects and your failure to progress with the work ... your right to proceed under the Subcontract Agreement is terminated" effective that day.

The next day, Subcontractor sent to Contractor three payment applications (one for each school), requesting payment for all of its work through July 24, 2001. In those applications for payment, Subcontractor claimed to have performed 20% of the work at Hawthorne, 10% of the work at Victory Villa, and 15% of the work at Chase. The total claimed for all three schools was $409,820. The Contractor refused to pay any of the claims.

Contractor replaced Subcontractor with subcontractor M. Nelson Barnes, a mechanical contractor that provided substantially greater manpower to the project. Nevertheless, on September 11, 2001, the County terminated Contractor for failing to perform the work on schedule. On September 14, 2001, the County made its only payment—*i.e.*, the only payment prior to a negotiated settlement of subsequent litigation—to Contractor in the amount of $695,697, for work performed by all subcontractors at all three schools. Contractor's vice president, John Higgins, testified at trial that the money received was devoted solely to paying M. Nelson Barnes and the suppliers of materials Subcontractor had ordered.

Contractor sued the County for wrongful termination, and, in the course of that litigation, Contractor took the position that the County itself was the source of the delays. Contractor and the County ultimately settled the suit, and Contractor was paid an additional $875,000. Contractor claims to have incurred additional costs in excess of that amount during its

efforts to complete the project after terminating Subcontractor.

After the settlement between County and Contractor, Subcontractor filed the complaint that is the subject of this appeal on April 13, 2006. Each of the four counts in the complaint claimed damages in the amount of $409,720.[1] The first count of the complaint alleged that Contractor breached the contract with Subcontractor by failing to pay the sums owed. The second count, labeled as an "alternative count," prayed that, "[i]n the event that [the circuit court] finds that there was no express contract between [Subcontractor] and [Contractor,] *then in the alternative*," Contractor "has been unjustly enriched by its receipt of labor and materials on the three Baltimore County Elementary School projects . . . ." The third count named Carolina as a defendant, and asserted a claim under the payment bond. The fourth and final count named as a defendant C.J. Frank, the founder and president of Contractor, and asserted a claim that he was personally liable to Subcontractor under the Maryland Construction Trust Statute, Maryland Code (1974, 2003 Repl.Vol.), § 9–202 of the Real Property Article ("RP"). Subcontractor later amended its complaint to add to the first and third counts claims for lost profits in the amount of $358,357. At the beginning of the trial, Subcontractor added a claim for attorney fees pursuant to RP § 9–303.

Contractor filed a counterclaim against Subcontractor, asserting that Subcontractor had breached its contract by performing in a manner that "was significantly deficient in terms of quality, productivity, progress and manpower." Contractor asserted that Subcontractor

> breached its agreement with [Contractor] by failing to perform its work in accordance with plans and specifications for the Project, failing to meet time frames established by its own progress schedule, failing to achieve the required quality standards of the project, failing to attain productivi-

---

1. Subcontractor explains in its reply brief that this figure is the result of a math error, and should have been $409,820.

ty requirements, failing to accomplish any meaningful progress in the prosecution of the work, and failing to appropriately and adequately man the Project.

In four counts, all based upon the premise that Subcontractor had breached its agreement, Contractor sought damages for the additional cost of engaging a replacement subcontractor to try to complete the project on time, the profit Contractor lost as a consequence of being terminated by the County for untimely performance, and other consequential costs caused by the County's termination of Contractor.

After the trial, the court issued a written opinion. The court made numerous findings of "proven facts," including the following:

7. [Subcontractor] performed in accordance with the drawings listed in the Subcontract Agreement.

\* \* \*

13. The mechanical work comprised approximately 50% of the entire scope of work on the three schools; therefore, [Subcontractor] was the lead subcontractor.

14. The electrical work for the three schools comprised 22% of the overall work. The electrical subcontractor, GPI, worked in the same areas as [Subcontractor].

15. By the end of July 2001, GPI invoiced from 14 to 78% work completed on the three schools and the County paid those invoices.

\* \* \*

24. Through May 31, 2001, [Subcontractor] billed less than 3% complete at Hawthorne Elementary School.

25. Through May 31, 2001, [Subcontractor] did not bill any completed work at Victory Villa Elementary School or Chase Elementary School.

26. On June 14, 2001, [Subcontractor's] subcontractor cut through a natural gas line while demolishing toilets in Hawthorne Elementary School.

27. The use of an acetylene torch on an active gas pipe was an unsafe practice.

\* \* \*

30. On June 27, 2001, employees of [Subcontractor's] sub-contractor, Tri–Source, set fire to fiberglass insulation materials while continuing to demolish equipment in the boiler room at Hawthorne Elementary.

\* \* \*

36. On July 18, 2001, Mr. Higgins [a vice president of Contractor], Mr. Frank and Mr. Snoops [principal of Subcontractor] met with County representatives to discuss the progress of the school renovation project.

37. County representatives indicated that [Contractor] would be terminated if improvement in the progress and performance of the work on the three schools did not occur.

38. [Subcontractor] performed the work at Chase, Victory Villa, and Hawthorne Elementary Schools as described in Plaintiff's Exhibits 11, 17 and 14.

39. [Subcontractor] completed 15% of the contract work at Chase Elementary, not including demolition work.

40. Through June 30, 2001, [Subcontractor] billed 9.5% complete at Hawthorne Elementary; 2.5% complete at Victory Villa Elementary; and 1% complete at Chase Elementary.

41. When M. Nelson Barnes arrived at the site, valves and strainers that should have been delivered to the site by [Subcontractor] were not available.

42. William Gough III [the project manager for M. Nelson Barnes] testified that as soon as M. Nelson Barnes began work it attempted to confirm releases and deliveries of equipment and specialties from suppliers and subcontractors, but learned that material and equipment critical for scheduling had not been released by [Subcontractor].

43. Tyco pumps, necessary to perform heating system work, had not been released by [Subcontractor] prior to its termination by [Contractor].

44. [Subcontractor] failed to have roof curbs and fans, balancing fittings, and circuits [sic] setting valves delivered prior to its termination by [Contractor].

45. Prior to its termination, [Subcontractor] had failed to perform hole cutting necessary for fan installation.

43. [Subcontractor] did not purchase louvers or wall boxes associated with the HVAC equipment for any of the three schools; nor had the cutting necessary for the installation of the louvers and wall boxes been performed by [Subcontractor].

47. Prior to its termination, [Subcontractor] had failed to purchase heat timer boiler controls for Chase and Victory Villa.

\* \* \*

54. [Contractor] sent numerous letters to [Subcontractor], demanding that [Subcontractor] provide sufficient manpower to all three schools.

55. [Subcontractor] did not respond to said letters.

56. County officials advised that staffing levels for electrical and mechanical activities were inadequate.

\* \* \*

61. M. Nelson Barnes provided substantially greater manpower for plumbing and mechanical work than had [Subcontractor].

The trial court's opinion noted that there was evidence in the record that would support Subcontractor's contention that the delays were caused by factors beyond its control, and there was evidence in the record to support Contractor's claim that Subcontractor failed to provide sufficient manpower to make satisfactory progress on the project, as demonstrated by the fact that progress accelerated after a replacement subcontractor was engaged. The court then stated that it was not

persuaded that either Contractor or Subcontractor had proven that the other breached the contract:

> Having carefully weighed all the evidence, the court finds itself in equipoise as to each party's claim for breach of contract against the other. [Contractor's] evidence supports its contention that [Subcontractor] failed to put sufficient numbers of qualified mechanics at the three schools, and used subcontractors who were barred from the job by the County for performing in a substandard manner. On the other hand, the record contains substantial evidence that the County caused much of the delay for which [Contractor] seeks to hold [Subcontractor] responsible in this lawsuit. Not the least of that evidence are the accusations made by [Contractor] in its litigation with the County. In brief, this court concludes that neither has [Contractor] proved by a preponderance of the evidence that [Subcontractor] failed to perform nor has [Subcontractor] proved by a preponderance of the evidence that it was wrongfully terminated from the school renovation project by [Contractor].

* * *

> [Contractor's] claim against [Subcontractor] must also fail for a failure to prove damages.

* * *

> This Court does not find that [Contractor] acted in bad faith in failing to pay [Subcontractor] for its work on a school renovation project. Accordingly, [Subcontractor's] claim against [Contractor] under the Maryland Prompt Payment Statute fails as well.

> For the reasons above stated, this Court grants Judgment in favor of [Contractor] et al[.] for all claims brought against [the defendants] by [Subcontractor] and grants Judgment in favor of [Subcontractor] for all claims brought against it by [Contractor].

Subcontractor has appealed, and Contractor has cross-appealed. Both of those parties argue that the trial court

erred, as a matter of law, in failing to rule in their favor respectively.[2]

## DISCUSSION

■■■ Under Maryland Rule 8–131(c), on appeal from a bench trial conducted in a circuit court,

> [w]e review the factual findings of the Circuit Court for clear error, observing due regard to the opportunity of the trial court to judge the credibility of the witnesses. If any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous.

*Figgins v. Cochrane*, 403 Md. 392, 409, 942 A.2d 736 (2008) (quotation marks and citations omitted). However, we review *de novo* the circuit court's conclusions of law. *Bender v. Schwartz*, 172 Md.App. 648, 664, 917 A.2d 142 (2007).

### 1. Countervailing Claims of Breach of Contract

Subcontractor argues that the trial court should have found Contractor liable for a breach of contract by wrongfully terminating Subcontractor on July 24, 2001. In essence, it argues that Subcontractor satisfactorily provided labor and materials valued at $409,820 prior to the time when Contractor gave notice of termination, and Contractor breached its contractual obligation to pay the agreed value of the labor and materials. Subcontractor also claimed its lost profits. On the other side

---

**2.** Under Maryland Rule 2–601(a), to qualify as a final judgment appealable pursuant to Md.Code (1971, 2006 Repl.Vol.), Courts and Judicial Proceedings Article, § 12–301, a circuit court's order must be set out in its own, separate document, apart from any opinion that explains the order. *Allstate v. State Farm*, 363 Md. 106, 117 n. 1, 767 A.2d 831 (2001). In this case, it appears that the trial court simply added "So ORDERED" at the conclusion of its opinion, and such an order does not satisfy the separate document requirement of Rule 2–601(a). Nevertheless, because it is clear from the court's written decision and the docket entries that the Memorandum and Order was intended as a full and final disposition of all issues, and because neither party has objected to the absence of a separate document, we may and do treat this procedural requirement as waived. *See Suburban Hosp. v. Kirson*, 362 Md. 140, 156, 763 A.2d 185 (2000).

of this controversy, Contractor argues that Subcontractor's failure to prosecute the work in a diligent manner put the project so far behind schedule that Subcontractor made it impossible for Contractor to meet the deadline for completion, and that such deficient progress on the part of the Subcontractor was a material default of the Subcontractor's obligations.

The trial judge declared a stalemate, stating: "Having carefully weighed all the evidence, the court finds itself in equipoise as to each party's claim for breach of contract against the other." Because each party bore the burden of persuasion for the respective claims for damages, the trial judge declared that neither had proved enough to persuade the court that the opposing party had breached the contract. The court "conclude[d] that neither has [Contractor] proved by a preponderance of the evidence that [Subcontractor] failed to perform nor has [Subcontractor] proved by a preponderance of the evidence that it was wrongfully terminated from the school renovation project by [Contractor]."

■ On a claim for breach of contract, the plaintiff (or counterplaintiff) asserting the claim for damages bears the burden of proving all elements of the cause of action, including plaintiff's own performance of all material contractual obligations. *Johnson & Higgins v. Simpson*, 163 Md. 574, 581, 163 A. 832 (1933) ("[O]ne who sues for the breach of a contract which requires him to perform certain acts before he becomes entitled to demand that for which he sues, must allege and prove performance on his part."); *Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 637 F.2d 257, 260–61 (4th Cir.1981) ("We think it certain that under Maryland law, a party suing on the contract must first prove his own performance, or an excuse for nonperformance, in order to recover for any breach by the opposing party."). Therefore, on Subcontractor's claim for breach of contract, Subcontractor had the burden of persuading the court that the lack of progress and delay was not attributable to any default in the Subcontractor's contractual obligations, whereas, on Contractor's counterclaim, it was

Contractor's burden to persuade the court that Subcontractor was at fault for the delay. The court found that each party failed to meet this burden of persuasion.

In *Eidelman v. Walker & Dunlop*, 265 Md. 538, 545, 290 A.2d 780 (1972), the Court of Appeals observed that, if the trier of fact's state of mind on an issue is in equipoise, then the judgment or verdict must be against the party that had the burden of persuasion on that issue. The Court stated:

> For many years juries have been instructed at the request of defense counsel to the effect that if the evidence on a given proposition left their minds in a state of even balance or equipoise, then their verdict should be for the defendant because the plaintiff had not met his burden of proof. . . . A judge sitting as a trier of fact is not expected to go further in reaching a conclusion from the evidence before him than a jury.

Similarly, in *Metropolitan Mtg. Fd., v. Basiliko*, 44 Md.App. 158, 167, 407 A.2d 773 (1979), this Court said with respect to a ruling by a judge that a party had not met its burden of proof:

> The situation, here, is similar to that in which an issue is submitted to a jury and the jury is unable to reach a decision as to the truth of the issue. This obviously is the traditional case in which the trier of fact has reached a state of evidential equipoise and the defendant is entitled to a verdict because the plaintiff has failed to meet his burden of proof. Under these circumstances, the verdict of the trial judge is not only not clearly erroneous but eminently correct.

In the present case, the same principle applies to the judge's judgment in favor of all defendants and the counterdefendant.

Subcontractor argues that the trial court's findings No. 7 and No. 38, quoted above, establish as a matter of law that Subcontractor was entitled to compensation for the work it did perform. But, in addition to the findings that confirmed that Subcontractor did perform some work on the project, the trial court also found that Subcontractor performed at a much

slower pace than the electrical subcontractor. The court noted: "During the same periods that [Subcontractor] claimed it could not work because of interference by school activities, the electrical contractor on the job was able to complete 78% of its work at Victory Villa, 58% at Hawthorne and 37% at Chase." In contrast, Subcontractor is claiming it completed 15.2% of total work under its subcontract as of the July 24, 2001. See also findings Nos. 14, 15, 39, 40. The trial court found that the County considered Subcontractor's rate of progress unsatisfactory (findings Nos. 36, 37, 54, 56), and "County officials advised that staffing levels for ... mechanical activities were inadequate." Delay in prosecuting Subcontractor's work was not an insignificant matter; to the contrary, the County was so dissatisfied with the lack of progress that the County terminated Contractor by letter dated September 11, 2001.

In our view, in order to recover for breach of contract, Subcontractor was obligated to prove not only that it did work in accordance with the plans and specifications, but also that it complied with the provisions of the contract regarding timely performance. The subcontract agreement not only stated that time was of the essence, but also provided that Subcontractor would "prosecute [its work] regularly, diligently and uninterruptedly *at such rate of progress in such a manner as to enable the Contractor to complete the entire structure within the time specified.*" (Emphasis added.)

In *Cambridge Tech. v. Argyle,* 146 Md.App. 415, 434, 807 A.2d 125 (2002), this Court held that a trial judge was clearly erroneous in finding that a supplier had "substantially performed" its obligations under a contract where the evidence reflected that the supplier had not delivered the products in compliance with the time requirements set forth in the contract. We quoted, *id.* at 431–32, 807 A.2d 125, from 15 RICHARD A. LORD, WILLISTON ON CONTRACTS, § 44.53 at 224–25 (4th ed.2000), to support our conclusion that the trial court in that case erred in finding substantial performance:

> "*A typical example of a clause requiring strict compliance is one making time of the essence of the contract; substan-*

*tial, although late, performance, is not generally sufficient to permit the party who has not performed in a timely manner to bring an action on the contract.*"

Given the trial court's findings about the lack of timely progress by Subcontractor, which was at least partially attributable to the manner in which Subcontractor staffed the job, there was no clear legal error in the trial court's conclusion that Subcontractor had not proven by a preponderance of the evidence that Subcontractor had performed all of its material obligations under the contract. *Cf. K & G Construction Co. v. Harris*, 223 Md. 305, 315, 164 A.2d 451 (1960) (subcontractor's negligent damage to contractor's wall was a material breach of subcontractor's promise to perform in a workmanlike manner).

 Subcontractor did not base its claim against Contractor upon a theory of quantum meruit, and was not entitled to compensation on that basis. And its claim in Count Two, based upon a theory of unjust enrichment, was to be considered "[i]n the event that [the circuit court] finds that there was no express contract between [Subcontractor] and [Contractor]." But the trial court did find that there was an express contract, the terms of which were set forth in Contractor's form subcontract that Subcontractor refused to sign but nevertheless adopted by conduct. Consequently, it was not error for the trial court to decline to make any award based upon unjust enrichment. *See Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 101, 747 A.2d 600 (2000) ("We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists.").

 With respect to the counterclaim, Contractor relies upon the trial court's Proven Fact No. 52 to support its argument that the trial court found facts that compel the legal conclusion that Contractor did prove Subcontractor's liability. Proven Fact No. 52 reads as follows: "On July 24, 2001, [Contractor] terminated [Subcontractor], 'By reason of your persistent failure to properly man the projects and your

failure to progress with the work ... [.]' " The use of quotation marks and the court's clearly stated legal conclusion that Contractor failed to prove Subcontractor's liability make clear that Proven Fact No. 52 merely recites Contractor's purported reason for terminating Subcontractor; it does not constitute the court's finding that the reason was correct, and does not contradict the trial court's overall finding that the Contractor failed to persuade the court that Subcontractor breached the contract.

## 2. Prompt Payment Statute

■ Subcontractor argues, in the alternative, that, under the Prompt Payment statute, RP § 9–302, Contractor owes the full $409,820 for the work Subcontractor performed. That statute states, in relevant part:

(a) *In general; exception.*— ... [A] contractor or subcontractor who does work or furnishes material under a contract shall be entitled to prompt payment under subsection (b) of this section.

(b) *Time for payments.*—

\* \* \*

(3) If the contract is not with an owner, the contractor or subcontractor shall pay undisputed amounts owed to its subcontractors within 7 days after receipt by the contractor or subcontractor of each payment received for its subcontractors' work or materials.

This issue is not preserved for appeal. Subcontractor never raised RP § 9–302 in its complaint. Subcontractor did raise the statute and its companion, RP § 9–303 ("Remedies") at trial, but only for the purpose of claiming entitlement to attorney fees.[3] Subcontractor never cited the Prompt Payment Statute at trial as an independent reason to find Contractor liable, and, under Md. Rule 8–131(a), Subcontractor

---

**3.** RP § 9–303(b) states: "If a court determines that an owner, contractor, or subcontractor has acted in bad faith by failing to pay any undisputed amounts owed as required under § 9–302 of this subtitle, the court may award to the prevailing party reasonable attorney's fees."

could not assert such a claim for the first time on appeal even if there were a meritorious basis for arguing that Contractor failed to promptly pay "undisputed amounts owed to" Subcontractor.

### 3. Construction Trust Statute

Subcontractor brought a claim against Mr. Frank, president of Contractor, under the Construction Trust Statute, RP § 9–202. That statute states:

Any officer, director, or managing agent of any contractor or subcontractor, who knowingly retains or uses the moneys held in trust under § 9–201 of this subtitle, or any part thereof, for any purpose other than to pay those subcontractors for whom the moneys are. held in trust, shall be personally liable to any person damaged by the action.

RP § 9–201 states, in relevant part:

(b) *Moneys to be held in trust.—*

(1) Any moneys paid under a contract by an owner to a contractor, or by the owner or contractor to a subcontractor for work done or materials furnished, or both, for or about a building by any subcontractor, shall be held in trust by the contractor or subcontractor, as trustee, for those subcontractors who did work or furnished materials, or both, for or about the building, for purposes of paying those subcontractors.

(2) An officer, director, or managing agent of a contractor or subcontractor who has direction over or control of money held in trust by a contractor or subcontractor under paragraph (1) of this subsection is a trustee for the purpose of paying the money to the subcontractors who are entitled to it.

In its opinion, the trial court did not expressly explain its ruling on Subcontractor's Construction Trust claim. We infer that the trial court's analysis was that Subcontractor failed to persuade the court that Contractor owed any money to Subcontractor, and therefore, Contractor's president could not have personal liability under the Construction Trust stat-

ute for failing to pay Subcontractor's unfounded applications for payment. We agree that personal liability of an officer under the Construction Trust statute is predicated upon the existence of an unpaid debt owing to a subcontractor. Accordingly, the court did not err in entering judgment in favor of Mr. Frank.

 Furthermore, the Construction Trust claim against Mr. Frank must fail because Subcontractor failed to present evidence to prove that any funds were "held in trust" on Subcontractor's behalf, under the relevant statutes. As we held in *Selby v. Williams Construction*, 180 Md.App. 53, 64–65, 948 A.2d 132 (2008):

> Where funds paid by [an owner] to [a contractor] are earmarked for payment to a specific payee, but payment is not made, and those funds can be tracked, personal liability may be imposed. However, the mere insufficiency of funds to pay all down-the-chain subcontractors or suppliers is not a basis for the imposition of personal liability on the managing agent of the debtor contractor corporation.

In this case, prior to settlement of litigation, the County made a single payment of $695,697 to Contractor on September 14, 2001, for work performed at all three schools. The record does not indicate that this money was specifically earmarked for Subcontractor, and Contractor's vice-president, Higgins, testified that all of this money was devoted to paying other construction costs—namely, for the services of Subcontractor's replacement, M. Nelson Barnes, and for the materials Subcontractor had ordered. Because the mere insufficiency of funds cannot support a Construction Trust claim, *Selby, supra*, 180 Md.App. at 64–65, 948 A.2d 132, the trial court was correct to find Frank not personally liable in any event.

### 4. Contractor's Cross–Appeal

Contractor challenges the trial court's alternative finding that Contractor failed to prove its damages with reasonable certainty. But we decline to consider this issue; it is a moot point because we have upheld the trial court's ruling that

neither party established a breach of contract by the other party to the transaction. In the absence of an established breach by Subcontractor, there is no need for us to consider the adequacy of Contractor's proof of its alleged damages.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND CROSS APPELLANT.**